■ CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, Respondent, v COLLEEN MCGRAHAM, Appellant. [905 NYS2d 86]—

Judgment, Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered January 13, 2009, in a proceeding pursuant to Education Law § 3020-a (5) and CPLR 7511 to vacate an impartial hearing officer's determination, dated February 16, 2007, which found that respondent teacher was guilty of serious misconduct unbecoming a person in the position of teacher, and imposing a penalty of 90 days suspension without pay and reassignment, granting the petition and remanding the matter for imposition of a new penalty, reversed, on the law, without costs, the award reinstated and the petition dismissed.

Respondent, a 36-year-old tenured high school teacher considered by the school's principal to be hard-working and conscientious, taught honors English to M.S., a 15-year-old boy who was known as one of the brightest and most talented students in the school. Respondent also served as an advisor to a poetry club in which M.S. was active. In order to facilitate after-hours communication concerning the poetry group, respondent provided her personal e-mail address to M.S. and another student. Thereafter, respondent and M.S. embarked on a series of frequent electronic communications, via e-mail and instant message, in which the two discussed literature, writing and movies. Respondent lent movies to M.S. that she thought he would find interesting, such as the documentary Fahrenheit 9/11. She also gave him a copy of the Catcher in the Rye.

In early 2005, respondent agreed to serve as faculty advisor to

a theater group formed by M.S. and several other students. The group met frequently and, consequently, respondent's contact with M.S. increased substantially. They regularly communicated electronically after school hours, often after midnight. The online conversations included personal matters affecting M.S., including issues he was having with his mother. Respondent continued to lend M.S. movies she thought he might find interesting, including Harold and Maude, a 1972 film depicting a relationship between a teenage boy and an older woman.

In May 2005, respondent felt compelled to discuss with M.S. the nature of their relationship. She claims this was because of several incidents, which included M.S. posting on his personal blog: "you crazy woman you, look what you do to my heart?" She also became concerned that once, during theater rehearsal, M.S. called her "Colleen my darling" and that another time during rehearsal he was standing particularly close to her. Respondent claims that she told M.S. during the discussion that their relationship had to be better defined. M.S. recalls respondent telling him that the lines in their relationship were becoming blurred and that she was "confused."

One month later, respondent and M.S. engaged in an instant message chat in which, according to M.S., respondent asked him whether he thought it was "crazy" or inappropriate for her to "think that there was something between us." Respondent, on the other hand, claims that after M.S. stated he was joking in the blog postings which alluded to feelings he had for her, she merely suggested that she must be "crazy" for thinking that M.S. was being sincere. This was the last electronic conversation between respondent and M.S., who ignored further entreaties by respondent to communicate.

On the last day of school in 2005, M.S. told another teacher about his communications with respondent. The teacher encouraged M.S. to file a report with the school's principal, which he did. The principal referred the matter to the Office of the Special Commissioner of Investigation, which opened an investigation. That night, respondent, unaware of the investigation, sent an e-mail to M.S., in which she stated that:

"I am not sure how we got to this place where we are not talking to each other. I think various feelings of hurt, fear, loss, anger etc. Powerful emotions that can make people act crazy even when they don't intend to . . .

"I want you to know I tried *so hard* to handle things in the right way, and feel I failed miserably. Constantly telling myself one thing, and at moments being overridden by emotion.

"Maybe you can understand, take pity and forgive. I know I

haven't dealt very well with this situation, due to several reasons. One is, in one way I never in a million years would have thought I would have found myself in this situation, and I did not know how to deal with what I felt. In another way it is a situation I haven't dealt with in 10 years, so maybe I am rusty or something. But obviously the particulars make this unique and complex, certainly for me. I hope this is not too cryptic.

"I hope at some point we will be able to talk and understand each other better. You have meant too much to me for this to end 'in silence and tears,' as the Byron poem says. But if you don't want to talk to me, I will do my best to understand. Know that my intention was never to hurt you, and I am sure that you as well did not intend the reverse. I don't know how people can get so far away from what they intend, maybe partly lack of communication and the mix of emotions. But I hope you know I am truly sorry."

In response to this e-mail, M.S.'s mother and the assigned investigator composed and sent an e-mail to respondent, purporting to be from M.S., which stated that M.S. was "confused" and suggested that he had similar emotions as respondent concerning their relationship. Respondent replied later that day by e-mail, stating that:

"I definitely relate to the chaotic mess in the head. I haven't meant to confuse the hell out of you. I just think the situation makes it incredibly confusing. I think we have both been afraid of being embarrassed. I think we have both been afraid of a lot of things. I feel like we have been doing this dance around each other since practically the beginning of the year.

"Because we have both been confused I have wanted us to talk. But that seems to create problems for both of us. When I have tried to talk to you, you seem to run a bit in the opposite direction. And my nervousness leads me to maybe not be entirely forthright. There is so much I would like to tell you, to discuss with you. But even now writing this, there is fear. You, I am sure, understand the risks involved for me. But you have no idea how happy it makes me to hear from you. And as far as where I am standing, there is only one place I would like to be standing. God, help me! So, I guess we should try to talk. I have often thought of the idea of talking over tea or coffee or the beach or something, I don't know how. I just didn't know how insane the idea was." The next day, respondent sent two additional e-mails to M.S. imploring him to talk so they could sort out their feelings.

The investigator confronted respondent with her various e-mails and instant messages on June 30, 2005. During the

interview, respondent admitted to the communications and acknowledged the inappropriateness of her actions, which she attributed to an "intellectual attraction" to M.S. that never resulted in physical contact. Shortly thereafter, respondent began therapy.

In early July 2005, M.S. discovered postings made by respondent to an on-line journal, under an alias. The entries for May and June 2005 consistently discussed respondent's strong feelings for an unidentified male. One entry described respondent and the person "standing . . . so close [to each other] I could feel the heat from his body radiate to me. I wanted to just let myself go, lean backwards and sink into him." Another talked about her desire to be "kissing him." Yet another stated that her thoughts regarding the person that day "were of a salacious nature." The vast majority of the postings, however, described the deep emotional pain respondent was experiencing from the person's decision to cease communicating with her.

In December 2005, after the investigation was concluded with a recommendation that respondent be terminated, petitioner filed charges against respondent, supported by five specifications. The first specification cited to each of the entries posted by respondent in the on-line diary. The second referred to respondent's statement to M.S. in May 2005 that the lines in their relationship were becoming blurred and the third specification was based on respondent's asking M.S. in June 2005 whether he thought it was "crazy" or inappropriate for her to "think that there was something between us." The fourth and fifth specifications concerned the e-mails sent by respondent to M.S. on June 23 and June 24, 2005, respectively, in which she implored him to get together for a talk about their feelings towards each other. The hearing officer granted respondent's motion to strike the first charge, stating that the on-line journal was not intended for M.S.'s consumption; however, the ruling expressly provided that the entries could be used for the limited purpose of illuminating respondent's state of mind when making the communications that supported the remaining charges.

Respondent was found guilty of specifications three, four and five, the hearing officer having found that by making each communication respondent had placed M.S. in an uncomfortable position and had acted in a fashion unbecoming of a person in her position. The second specification was dismissed based on the fact that M.S. continued to communicate with respondent after she told him that their relationship had become "blurred." Describing respondent's behavior as "serious" and the type that "tends to destroy the teacher/student relationship," the

hearing officer stated that it called for a "significant" penalty. In fashioning the penalty, he took note of respondent's remorse when confronted by the investigator and that she ceased all communications with M.S. at that time and shut down her on-line diary. The hearing officer credited respondent's testimony that she gained a valuable lesson regarding the importance of appropriate student-teacher relationships and that she had sought therapy to deal with the emotional issues underlying her behavior. Based on his belief that respondent would not allow such a situation to occur again, he opted not to terminate her, but rather to suspend her without pay for 90 days, and to have her reassigned to a different school.

Petitioner commenced this proceeding, seeking an order vacating or modifying the arbitration award. Petitioner alleged that the dismissal of the second specification was "illogical and irrational" because the communication alleged therein was inappropriate, whether or not it made M.S. feel uncomfortable. It further contended that the penalty was inconsistent with the state's strong public policy interest in maintaining a safe environment in the schools. Petitioner asserted that the hearing officer's conclusion that respondent would not repeat her behavior was irrational.

Supreme Court granted the petition. The court acknowledged that the standard of review mandated by Education Law § 3020-a is that of CPLR article 75, which provides that an arbitration award may only be vacated on a showing of "misconduct, bias, excess of power or procedural defects" (*Austin v Board of Educ. of City School Dist. of City of N.Y.*, 280 AD2d 365, 365 [2001]; *see* CPLR 7511 [b] [1]). However, following recent precedent from this Department, the court applied a "hybrid" standard which incorporated the arbitrary and capricious test embodied in CPLR article 78. Utilizing this standard, the court concluded that "the penalty imposed by the arbitrator of a mere 90 day suspension violates a strong public policy to protect children and is accordingly without a rational basis." The court further stated that "[t]he arbitrator's observation regarding the inappropriateness of placing a child in a position of a consenting adult is at the heart of why the penalty of a three month suspension is not rational and does not serve the public policy of protecting children. The arbitrator seems to have been impressed by the fact that the child had gone to college and had 'moved on with his life . . .' as well as that there had not been any physical contact between Ms. McGraham and her student and that the teacher had not actually asked MS out on a date. But as was noted by Justice Acosta in *City School*

*Dist. of City of N.Y. v Hershkowitz* (7 Misc 3d 1012[A] [2005]) . . . it is irrational to use a student's resolve in the face of a teacher's improper and persistent advances, to minimize the teacher's improper conduct. Furthermore, in *Hershkowitz*, as is the case here, the arbitrator has 'failed to appreciate the harm that respondent's behavior may have on a child, both presently and in the future, by [respondent's] inappropriate conduct, even if [respondent] did not 'cross the line' and have physical contact with [the student]. *(id.)*"

Respondent does not question that Supreme Court applied the correct standard. Indeed, while CPLR 7511 is dictated by Education Law § 3020-a to be the proper standard of review, this Court has held that "where the parties have submitted to compulsory arbitration, judicial scrutiny is stricter than that for a determination rendered where the parties have submitted to voluntary arbitration" (*Lackow v Department of Educ. [or "Board"] of City of N.Y.*, 51 AD3d 563, 567 [2008]). Because the arbitration at issue was compulsory, "[t]he determination must be in accord with due process and supported by adequate evidence, and must also be rational and satisfy the arbitrary and capricious standards of CPLR article 78" *(id.)*.

Applying this standard, we discern no basis upon which the court should have disturbed the hearing officer's determination. Under the circumstances of this case, we may not vacate on the ground that it is contrary to public policy. It is beyond question that, in the broadest sense of the term, there is a strong public policy in preventing student/teacher relationships that, whether of a sexual nature or not, threaten students' well-being. In upsetting an arbitral award on public policy grounds, however, more than a general societal concern must be at issue. Rather, the public policy exception applies only in " 'cases in which public policy considerations, embodied in statute or decisional law, prohibit, *in an absolute sense*, particular matters being decided or certain relief being granted by an arbitrator' " (*Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO*, 99 NY2d 1, 7 [2002], quoting *Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 631 [1979]). Moreover, "courts must be able to examine an arbitration . . . award on its face, without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement" (*Sprinzen*, 46 NY2d at 631).

Transport Workers involved two arbitral decisions arising out of separate accidents, one caused by the negligence of a train operator, another by the negligence of a bus operator which resulted in a pedestrian being injured. In both cases, the arbitra-

tor declined to dismiss the transportation workers, instead demoting one worker for six months and docking him six weeks' pay, and docking the other over four months' pay and effectively placing him on probation. The public authority in each case challenged the awards, relying on Public Authorities Law § 1204 (15), which grants to the authorities at issue the power "[t]o exercise all requisite and necessary authority to manage, control and direct the maintenance and operation of transit facilities . . . for the convenience and safety of the public." The Court of Appeals rejected this position, finding that "[t]he legislative authority to 'manage, control and direct' the operation of New York City's public transportation system for the 'convenience and safety of the public' does not translate into a statutory prohibition against some relinquishment to arbitrators of the final say in safety matters when they arise in the context of employee discipline" (99 NY2d at 9). Nor did the Court find that such authority, "in any direct, let alone *absolute*, sense set forth requirements or standards for the disciplining of employees violating safety rules" (99 NY2d at 12).

Here, in claiming that the award violates public policy, petitioner points to article 10 of the Family Court Act and Social Services Law § 384-a. These are both statutory schemes which expressly recognize the paramount importance of the safety and welfare of children. However, they do not in any way govern school disciplinary proceedings, much less mandate the type of penalty which is appropriate in such proceedings. Indeed, the public policy at issue here is no different than the equally important public policy of protecting the physical safety of the riders of public transportation which was at issue in *Transport Workers*, and which was rejected by the Court of Appeals as forming the basis for the overturning of the arbitrator's awards in that case. We recognize that this conclusion appears to be directly at odds with the Third Department's decision in *Matter of Binghamton City School Dist. (Peacock)* (33 AD3d 1074 [2006], *appeal dismissed* 8 NY3d 840 [2007]) and the Second Department's decision in *Matter of Board of Educ. of E. Hampton Union Free School Dist. v Yusko* (269 AD2d 445 [2000]). However, for the reasons set forth by the dissent in *Matter of Binghamton,* we think that *Transport Workers* compels a different result from the ones reached in those cases. Further, the award in this case recognizes the seriousness of the allegations and imposes a penalty which we do not think is disproportionate to the charges (*see Transport Workers*, 99 NY2d at 11 [finding that "although the awards directed reinstatement of the employees, they clearly did not disregard safety concerns and the seriousness of the breaches of safety rules. Instead, they imposed serious financial sanctions in both cases"]).

Moreover, we find the penalty imposed here not to be so lenient as to have been arbitrary or capricious. Preliminarily, Supreme Court is incorrect that the hearing officer found the absence of physical contact and the fact that M.S. seemed to have "moved on with his life" to be mitigating factors. While the award discusses these facts, there is no evidence that the final disposition relied on them. To the contrary, the hearing officer condemned respondent's behavior in no uncertain terms, and the only mitigating factors he found revolved around respondent's remorse and the actions she took to prevent the problem from recurring. The hearing officer's conclusion that respondent was not likely to repeat her actions was necessarily a determination based on respondent's credibility, and he was in a far superior position than Supreme Court to make that determination (see *Whitten v Martinez*, 24 AD3d 285, 286 [2005]). Moreover, the determination was based on specific actions taken by respondent such as her decision to seek treatment and her cessation of contact with M.S. Under those circumstances, the sanction was appropriate.

This case contrasts sharply with *Matter of Binghamton*, cited by Supreme Court and the dissent. There, the Court, in affirming the vacatur of a one-year suspension that Supreme Court had found "shockingly lenient" (33 AD3d at 1076) noted that the teacher "showed no remorse for the conduct proven by petitioners, disobeyed administrative direction to cease his relationship with the student and not transport her in his car, and continued to contact her even after disciplinary charges were brought against him" (33 AD3d at 1077). This case is also distinguishable from *Lackow v Department of Educ. (or "Board") of City of N.Y.* (51 AD3d 563 [2008], *supra*), upholding the sanction of dismissal, where the teacher had been warned three times about the inappropriateness of his behavior, yet allowed it to continue. To be sure, we do not disagree with the dissent that respondent's behavior was highly inappropriate. We simply disagree that the evidence demonstrates that respondent is unrepentant and likely to pursue inappropriate relationships with students in the future. The dissent places too much emphasis on the on-line diary. The entries were not, as the dissent describes them, "communications," but rather respondent's musings which she posted under an alias on a public website without informing the student that she had done so. Moreover, the hearing officer found that, at best, the entries confirmed that respondent had "romantic" feelings toward M.S. To the extent, however, that they express a desire to commence a physical relationship with M.S., we can only speculate that respondent planned to actually pursue such a course. Again, we do not

condone respondent's communicated desire to even talk to the student about her feelings toward him, but the question before us is only whether there was a rational basis for the hearing officer to conclude that respondent is not a sexual predator who is unable to respect the boundaries that must exist between educators and their charges.

Finally, we do not view this case as being analogous to *City School Dist. of City of N.Y. v Hershkowitz* (7 Misc 3d 1012[A], 2005 NY Slip Op 50569[U] [2005]), in which our dissenting colleague found a one-year suspension to be inadequate where a teacher pursued a relationship with a student. First, the behavior in that case was far more egregious. The teacher sent sexually explicit e-mails to the student in which he directly invited her to have sex with him. Second, the teacher acted deceptively by instructing the student on how to keep his behavior hidden from her mother. Third, when the student's mother did find out, the teacher contacted the mother and discouraged her from making "a big deal" out of his conduct. Finally, it does not appear from the *Hershkowitz* decision that, as here, the teacher showed remorse and took affirmative steps to reform himself such as seeking therapy. In fact, Justice Acosta rejected out of hand the teacher's claim that he was capable of rehabilitation. The sole basis for that contention was the teacher's attorney's statement that his client had not engaged in any misconduct for the six years that he had been on administrative duty while the charges were pending, an assertion which Justice Acosta called "speculative and unsustainable" and "unworthy of credence" (2005 NY Slip Op 50569[U], *7). Here, the hearing officer had a strong basis for concluding that respondent could be trusted once again to teach students. Accordingly, his decision to suspend respondent, but not terminate her, was supported by the evidence and not arbitrary and capricious. Concur—Mazzarelli, J.P., Moskowitz and Renwick, JJ.

Saxe and Acosta, JJ., dissent in a memorandum by Acosta, J., as follows: Because I believe that the 90 day penalty imposed is irrational and disconnected from the strong public policy of protecting children from improper conduct by those entrusted to educate and guard them, I respectfully dissent.

Respondent is a tenured high school teacher employed by petitioner. In December 2005, respondent was charged with inappropriate intimate conduct with one of her students.

Pursuant to New York Education Law § 3020-a, an arbitration hearing on the charges was held before an arbitrator, who sustained three out of the five charges against respondent. The

Department of Education (DOE) presented evidence to support the charges and specifications, which included e-mail and instant message communications between respondent and her student, M.S., and respondent's personal blog relating her feelings toward her student. Respondent argued that she believed M.S. had inappropriate feelings for her, and that her blog entries were an attempt to clarify their relationship.[1] Some of these communications include the following:

"May 02, 2005—Why do the tears always come? My feelings for him are so strong, and I can't say or do anything—I love being close to him, talking to him, being around him, but it is just so filled with pain at times also. Today at one point he was standing behind me so close I could feel the heat from his body radiate to me. I *wanted to just let myself go, lean backwards and sink into him* . . .

"May 05, 2005—Do I enjoy insanity? I know I enjoy feeling strong emotions. I know I just like being with him, talking with him. And what that is wrong?

"May 23, 2005—In my heart I just feel I don't care about anything else but having the chance of being with him. Talking with him, *kissing him*. When he gets back I hope I can do what I want. I want to tell him that I think we should go out for coffee or tea and talk. Maybe go to the Muddy Cup . . . I want to talk to him about everything. Clear everything up. Ultimately I would love to tell him how I feel about him. And to know how he feels.

"May 28, 2005—All I have thought about is it *moving beyond the realm of fantasy*. I want it to be more. But it is scary, for oh so many reasons. I've just been thinking about him so much. *Today my thoughts were of a salacious nature.* I can't wait to see him, but I also feel nervous" (emphasis added).

From May 2, 2005 to July 1, 2005, the record shows that respondent wrote 20 such blog entries. On or about June 23, 2005, respondent wrote to M.S. among other things, the following: "There is so much I would like to tell you, to discuss with you. But even now writing this, there is fear. *You, I am sure, understand the risks involved for me.* But you have no idea how happy it makes me to hear from you. And as far as where I am standing, there is only one place I would like to be standing. God, help me so! So, I guess we should try to talk. I have often

---

**1.** Respondent's contention that her Xanga blog entries were not intended to communicate to internet users, including her student, is belied by respondent unwittingly conceding that on certain occasions she posted her blogs in specific response to blog entries by her student.

thought of the idea of talking over tea or coffee or the beach or something, I don't know. I just didn't know how insane the idea was" (emphasis added).

Based on the blog entries and communications between respondent and M.S., the arbitrator agreed with DOE that respondent had allowed an inappropriate relationship to develop, had attempted to communicate her feelings, and ultimately attempted to blame the student for having feelings for her. The arbitrator imposed a penalty of suspension without pay for 90 days, to be followed by reassignment to another school.

Thereafter, petitioner commenced this proceeding to vacate, or in the alternative, modify the penalty imposed by the arbitrator. In a detailed 17 page decision, Supreme Court granted the petition, vacated the arbitrator's decision and remanded the matter for the imposition of a new penalty. I believe Supreme Court properly vacated the arbitrator's award as being irrational and violative of New York State's public policy to protect children from harmful conduct of adults in loco parentis.

Initially, and significantly, the issue in this case is not limited to whether the 90-day suspension is appropriate under the circumstances. Rather, the issue is whether the suspension is rational absent a specific finding that respondent, who was placed in a position of authority over children and who betrayed that trust and her responsibility, does not pose a danger to those students. Given the facts of this case, I do not believe the 90-day penalty is rational or that it deals appropriately with the public policy interest of protecting children against future misconduct by returning respondent to a different school following her suspension. This belief is not based on the length of the penalty, but rather on its failure to adequately ensure against future similar misconduct. The record is devoid of any evidence that once respondent is placed back in an environment with adolescent students, she will not continue her improper conduct.

The penalty imposed by the Arbitrator was based in part on the arbitrator's conclusion that respondent's "remorsefulness and subsequent actions and prior record" demonstrated that respondent would not engage in this type of conduct in the future. This was an irrational conclusion. Respondent did express belated remorse for the situation she was in, but nevertheless *continued* to pursue a romantic relationship with her student. A pointed example is respondent's June 26, 2005 blog entry: "This is just so difficult. Because of course with in the realm of the way things are 'supposed' to be, obviously it is crazy. But life is all about things that don't happen like the norm. Many crazier

things have happened and been okay"; respondent continues to write, "Damn the consequences." It could not be any clearer that whatever hesitation respondent may have had about her pursuit of her student, she determined the consequences were worth it, including shattering the sacred student-teacher relationship.

The arbitrator's reliance on respondent's "subsequent actions" is likewise irrational. An investigation of respondent's conduct was commenced on or about June 15, 2005. During the interim, respondent continued her pursuit of M.S.,[2] and was subsequently called in for an interview on June 30, 2005 by the Office of the Special Commissioner of Investigation. It was only after this interview that respondent claims that she sought therapy. Prior to this, while respondent had acknowledged the impropriety of her feelings, she refused to correct them or to seek therapy until responsible adults intervened. Once the investigation commenced, respondent was forced to avoid contact with M.S. It was not by her own volition. I disagree with the majority that this forced cessation of contact with the student may be considered as an act of remorse.

Nor does the lack of any physical contact between respondent and the student justify the 90 day suspension. New York State has an "explicit and compelling public policy to protect children from harmful conduct of adults" (*Matter of Binghamton City School Dist. [Peacock]*, 33 AD3d 1074, 1076 [2006], *appeal dismissed* 8 NY3d 840 [2007]). This public policy overrides the absence of physical contact in this case. In *Binghamton*, the Third Department correctly noted, I believe, that a court's authority to overturn an arbitration award based on public policy grounds includes the state's compelling interest in protecting our children. The Second Department has likewise recognized that an arbitration award that does not sufficiently protect the children of the state can be vacated on public policy grounds (*Matter of Board of Educ. of E. Hampton Union Free School Dist. v Yusko*, 269 AD2d 445 [2000]). Indeed, placing emphasis on physical contact alone misses the point. Respondent's conduct was in fact harmful to her teenage student, and it is conduct that New York guards against.

To be sure, the lack of physical contact here is of no benefit to respondent inasmuch as it resulted from the child alerting adults and not from respondent's lack of effort. Indeed, the record clearly demonstrates that it was the student's maturity and resistance to respondent that prevented any carnal interaction,

---

2. On June 30, 2005 respondent wrote "the connection between us is so incredible and special that we will be together in the future."

to the dismay of respondent. Again, some of respondent's blog entries are telling. On May 2, 2005, respondent wrote, "Today at one point he was standing behind me so close I could feel the heat from his body radiate to me. I wanted to just let myself go, lean backwards and sink into him." On May 23, 2005, respondent wrote that she just cared about being with her student and "kissing him." A few days later, respondent began thinking about "moving beyond the realm of fantasy," and her thoughts "were of a salacious nature."

These examples, combined with respondent's relentless pursuit of her pupil, undoubtedly show that given the opportunity respondent would have moved "beyond the realm of fantasy." For example, respondent expressed her frustration of unrequited love on June 11, 2005, when she declared "I ha[t]e you: For not being honest with me. For making it seem so easy to let go, when all I want to do is hold on. For playing with my heart. For being what you are. For not holding me in your arms and telling me it will all be okay. For entering my life. Yet, still I want nothing more than to be with you."

An educator must be in control of her emotions and respect the boundaries required by her privileged position. The record is replete with examples of respondent allowing her emotions and improper thoughts to get the best of her. On May 5, 2005, respondent confidently asserted that "I know I enjoy feeling strong emotions." On June 14, 2005, respondent expressed hurt and anger toward a minor avoiding her romantic advances: "I had to leave, went down to the beach to let out the racking sobs. If I can't let this go, I don't know what is going to happen to me. It hurts so much. I am so angry at him. Yet, my heart refuses to let go." Respondent's June 27, 2005 blog makes it crystal clear that she had no control of her emotions and thoughts, and the line of teacher and student was completely gone in her mind: "I cry, and cry, and cry, to what end . . . I don't know why him, I don't know how, I don't know anything anymore. I don't know what I am doing, or how I will go on. I have never faced anything this difficult in my life . . . Why did he bother to contact me if he didn't want us to talk? That's what kills me."

The arbitrator's penalty does not address the state's interest in protecting children from a person who is unable to control such "strong emotions," and what steps respondent would take during the suspension period to keep her emotions under control. It is evident that the last thing on respondent's mind was to do her job, namely to educate her student. And that is precisely what the penalty must address; it must not only pun-

ish the teacher's misconduct, but fully protect students and guarantee that all efforts have been made to keep them from such a dangerous environment. Contrary to the majority's position, it is speculative to conclude that respondent *has* been rehabilitated. The majority points to no evidence to buttress its position that respondent, after serving a completely arbitrary temporal penalty, is fit to teach male teenage students. As noted, respondent self-servingly claims that she sought therapy after getting caught responding to the Special Commissioner of Investigation's e-mail; yet respondent does not identify what therapy she underwent, the time period, and her progress, if any. I believe it is dangerous to the students of this state to allow teachers who have allowed themselves to be "attracted" to their students, whether "intellectually" or physically, to merely state, without more, that they are fit to teach after serving a specified suspension period.

Finally, respondent argues that Supreme Court improperly likened this case to that of *City School Dist. of City of N.Y. v Hershkowitz* (7 Misc 3d 1012[A], 2005 NY Slip Op 50569[U] [2005]). I disagree. While the facts in *Hershkowitz* are different and respondent's overt actions therein were far more egregious, I believe there is a parallel. For example, in both instances, the teachers who were entrusted to educate and protect the children in their care attempted to engage them in a sexual manner. Unlike the respondent in *Hershkowitz*, respondent here was careful to cloak her intentions and thoughts in a more discrete and "romantic" way. Her communications were not outright vulgar or sexually explicit in nature as they were in *Hershkowitz*; the communications, nevertheless, very subtly demonstrated her sexual interest in a minor entrusted to her, just as the respondent in *Hershkowitz*. I, however, do not believe that respondent here should be protected because of her subtlety. In both *Hershkowitz* and here, the evidence indicated that the teachers were insufficiently rehabilitated to be trusted with the education of their students, and the penalty imposed failed to address the state's public policy interests in protecting students.

For these reasons, I would affirm Supreme Court's order to vacate the arbitration award and remand the matter for imposition of a new penalty.